THE STATE, JOHN M. CHAMBERLAIN ET AL., PROSECUTORS, v. THE BOARD OF EDUCATION OF THE TOWNSHIP OF CRANBURY, IN THE COUNTY OF MIDDLESEX.

1. A vote to appropriate money for school purposes and to issue bonds includes the power to raise the same by special assessment upon the property of the school district.
2. Money can be voted for the purpose of purchasing land and erecting a school building, at a special meeting of the inhabitants of a school district, duly called.
3. The purchase of land and erection of a school-house includes fencing and grading the lot, supplying the school property with drinking-water and equipping the school-house with school furniture.
4. By ballot is a legal method of voting to raise money at any school district meeting. The act of 1889 (*Pamph. L., p.* 132), enjoining the use of the ballot in voting to raise money, is not repealed by the act of 1894 (*Pamph. L., p.* 506).
5. The act of 1887 (*Pamph. L., p.* 149), which confers upon females the right to vote at any school meeting, although unconstitutional so far as it assumed to confer the right to vote for school trustees, is valid in respect to all other privileges granted, including the right to vote to raise money and to issue bonds.

On *certiorari.*

On August 22d, 1894, the board of education of the township of Cranbury, in the county of Middlesex, ordered the district clerk and president of the board to prepare and post notices to call the legal voters of the school district of the township of Cranbury together, at a special school meeting, at three o'clock on September 15th, 1894. The propositions to be set out in the notice as those upon which the voters were to express their sentiments were fixed by the board of education.

The notices contained the following propositions: *First.* To vote and appropriate the sum of $1,600 to purchase a lot of land. *Second.* To vote and appropriate the sum of $400 for grading and fencing the said lot and furnishing drinking-water supply. *Third.* To vote and appropriate $4,000 for erecting a school-house on the lot. *Fourth.* To vote and appropriate the sum of $500 for purchasing suitable furniture for the school building. *Fifth.* To authorize the board of education, in order that immediate funds may be procured for the purposes above mentioned, to issue school bonds in the corporate name of "The Board of Education of the Township of Cranbury, in the County of Midddlesex," to the amount of $6,500, payable at such time and in such amounts as the legal voters at such meeting may direct, with interest at a rate not to exceed six per centum per annum, payable semi-annually. *Sixth.* To vote and appropriate for the purpose of purchasing free school text-books the sum of $300. *Seventh.* To vote and appropriate for the purpose of paying for the services rendered to the board by the district clerk at the monthly ratio of $100 per year. *Eighth.* To vote and appropriate for the purchasing of crayon, brooms, pails and other necessary school supplies, and meeting the expenses of cleaning of and caring for the school-rooms, the sum of $100.

The amount thought to be necessary for above purposes is the sum of $7,000.

On the day fixed for the meeting, each of these propositions was printed upon one ballot. Each proposition, except the one concerning the issuing of bonds, was preceded by the words, "That we order to be raised, by special assessment on the inhabitants of the township of Cranbury school district and their estates, and the taxable property therein, the sum of ———— dollars."

The number of ballots upon which the voters favored all of the propositions were a majority of all those cast. Among those who voted at this meeting were women. The proposition in respect to the issuance of bonds, as printed upon the ballots and voted for by the majority of the voters, was as follows:

"*Resolved*, That the Board of Education of the Township of Cranbury, in order to raise immediate funds for the purposes above mentioned, be authorized, and we do hereby authorize said Board, to issue school bonds in the corporate name of The Board of Education of the Township of Cranbury, in the County of Middlesex, to the amount of $6,500, in order to raise said needed amount immediately, in the denomination of $200, each at a rate of interest not to exceed six per cent. per annum, payable semi-annually at the National Bank of Cranbury. The bonds hereby authorized to be issued are to fall due and be paid two each year during the first ten years, and three thereafter, until all are paid and the necessary amount raised at the annual meeting of each year, until all the outstanding bonds and the accrued interest thereon shall have been paid."

Argued at November Term, 1894, before Justices REED and GARRISON.

For the prosecutors, *Alan H. Strong.*

For the defendants, *H. Brewster Willis.*

The opinion of the court was delivered by

REED, J. The proceedings ordering the raising of the amount mentioned in the propositions carried at the special meeting is first attacked upon the ground that the measures voted for were aside from and in excess of the notice of the purpose of the special meeting. This position is rested upon the fact that the notice contains no mention of the purpose to raise the amount to be voted for by special assessment, but only mentions the purpose to issue bonds by which the amount to be appropriated was to be immediately raised.

It is insisted that votes to raise the several amounts by special assessment are not within the scope of the notice. It is also insisted that a vote to raise such sums by special assessment, in addition to the vote to issue school bonds to the

amount of $6,500, provided for the raising of a total amount, which is in excess of the amount designated in the notice.

In respect to the first of these points, it is entirely clear that the part of the several propositions which provides that the respective sums voted for were to be raised by levy upon the property of the school district, was redundant. The votes to raise and appropriate this amount for the purpose indicated in the propositions carried with them, as a legal consequence, that such moneys should be immediately or remotely raised by a special tax levy.

It follows, therefore, that notice that voters would be called upon to express their sentiments in respect to the respective propositions to vote and appropriate money, contained an implied notification that if such money was voted it would be raised according to the statute, namely, by tax levied upon the school district.

In respect to the second point, I cannot see how anyone reading the propositions as they were carried at the election could imagine that the sums to be raised by the tax levy were to be in addition to the sums which were to be raised by the issue of bonds. The sums voted for were to be raised by special tax, but when that tax was to be levied depended upon whether bonds were to be issued, and if bonds were to be issued, then it depended upon the times when such bonds should mature.

The purport of the proposition was that bonds were to be issued for a sum sufficient to cover the aggregate appropriations for the purchase of land and the erection of a school-house, and that the money to pay these bonds was to be levied by special assessment, according to the provisions of sections 19 and 20 of the act of 1894. *Pamph. L., p.* 514. These sections, read in connection with section 11 of the same statute, leaves the meaning of the ballots entirely free from obscurity.

The next point made against the legality of the proceedings is that no money can be ordered to be raised for the purpose of purchasing a lot or building a school-house except at a meeting held for the election of school trustees.

The meeting in the present instance was specially called by the board of education, and was not a general meeting for the election of school trustees. The power to make the appropriations for the purpose mentioned seems to be settled by previous adjudications. It will be perceived, by a comparison of sections 39 and 86 of the revised act of 1874 (*Rev.*, p. 1070) with the amendatory act of 1894 (*Pamph. L.*, p. 506), that the power of the board of education, under the provisions of the latter act, is left in the same condition as the power of the trustees under the former act in respect to the subject-matter now in question.

The time of holding the general meeting is changed by the act of 1894. Under the act of 1874 the general meeting for the purpose of determining what additional tax, if any, shall be levied upon the school district, was directed to be held on the Tuesday of the week following the annual town meeting. In the act of 1894, such meeting and the meeting for the election of trustees are directed to be held upon the same day, namely, the third Tuesday in March. In all other respects, section 86 of the act of 1894 and section 86 of the act of 1874, with some changes in the phraseology, remain substantially the same.

So, also, it will be perceived that subdivision 11 of section 39 of the act of 1874, which subdivision provides for the calling of special meetings by the school trustees, is left undisturbed in the act of 1894 as subdivision 10 of section 39.

Now, in respect to the powers of the board of school trustees under the act of 1874. It has been held that, by virtue of the powers conferred in section 39, subdivision 11, the trustees had the power to call a meeting at any time when, in their judgment, the interests of the district might require it for the purpose of building school-houses and appropriating money for that purpose, as well as for the purpose of raising money by bonding the district. *Stackhouse* v. *Clark*, 23 *Vroom* 291.

It will also be seen that this same section stood in the general act of 1867 (*Nix. Dig.*, p. 69), and that section 80 of the

act of 1867 is substantially section 86 of the acts of 1874 and 1894.

Now, the power to vote for the building of a new school-house at a special meeting, under the act of 1867, was recognized in the case of *State, ex rel. Duryee & Angle*, v. *Greenleaf*, 5 *Vroom* 441.

So it seems that the power to pass and adopt these propositions at a special meeting was plenary.

The third point made against the proceedings is that section 88 of the act of 1894 only empowers the voters to issue bonds for the purpose of purchasing land, or building a school-house, but not for the purpose of fencing, grading, furnishing, procuring a water-supply, and the other purposes mentioned in the notices.

Now, it will be perceived that in the notices and the propositions which are certified to be those carried at the special election, it is explicitly stated that the bonds were to be issued to raise funds for the following appropriations: For purchasing a lot, for grading and fencing it, and for providing a proper drinking-water supply; for erecting a school-house and for purchasing school furniture. An inspection of the ticket carried shows that the sum of $6,500, the amount to be raised by the issue of bonds, covers the amount appropriated for these items only. Now, these were all matters of expenditure included within the language of section 88.

The grading, fencing of the lot, digging of a well, or providing other means for supplying the school with water, the equipping of the school-house with school furniture, all were a legitimate part of the construction of a school-house and the proper equipment of a school property.

It is, in the next place, insisted that the method of voting adopted was illegal. This point is directed at the use of the ballot in voting upon the question whether the amounts of money should be appropriated for the purposes named. This method of voting, it is urged, could only be adopted by the permission or direction of some statute, and that no such statute exists.

I am unable to accede to the soundness of either of the two propositions included within this insistence. I am of the opinion that such a method of the expression of the popular will could be adopted by those assembled without legislative permission. I also think that there existed a statute which made such a method of voting, when the question to be decided was whether money should be raised for purchasing land or building school-houses, imperative.

In opposition to the legality of the use of the ballot without legislative authority, one case only is cited. This is the case of *Faulkner* v. *Elger*, 4 *Barn. & C.* 449, in which case three judges of the Court of King's Bench expressed a doubt whether an election by ballot to fill a vacancy in a curacy in a parish was legal. The ground upon which the judges thought the use of the ballot to be unwarranted was because of its secrecy. It was said that if it should subsequently be ascertained that some person who had voted was disentitled to vote, it would be impossible to tell how he had voted. The effect of the illegal vote upon the result would, therefore, be unascertainable. The case, however, was decided upon another point, and so the remarks of the judges were' *obiter*. This case was decided in 1835, and neither before nor since, so far as I know, has the question been mooted in any court.

I think that the inconvenience resulting from the ballot was in that case unduly magnified. If a vote be taken at a meeting of any considerable number of people, whether taken *viva voce* or by marking, it would afterward be difficult to ascertain how each person had voted. No system of voting would secure an accurate method of discovering this but a system which compelled each voter to attach his name to his vote. Yet, it would not be pretended that such a system is requisite to legalize an election.

As a question of public policy, the advantages arising from the use of the ballot entirely overrides its disadvantages. The independence it secures to the voter has commended it to the taste and judgment of the people, so that during the last half century it has become the almost universal method of

registering public sentiment.  Unless restrained by some statute, I see no reason why this method may not as well be adopted as any other by a majority vote of those present at a meeting.  This was what happened in the present instance, for after the meeting was organized it was moved and resolved to vote by ballot.  But I also think that this method of voting was, in the present instance, mandatory.  The second section of the act of 1889 (*Pamph. L., p.* 132) directs that " at each and every annual or special school meeting, held in any school district in this state, the legal voters thereof should vote by ballot, and not otherwise, to raise money for any school purpose whatever."

The counsel for the prosecution argues that this section was repealed by a supplement to the act entitled "An act to establish a system of public instruction," which supplement was passed in 1894.  *Pamph. L., p.* 506.  It is not insisted that there was any express repealer contained in the last-mentioned statute.  It is insisted that the act of 1894 repeals section 2 of the act of 1889 by implication.

The line of argument by which this view is supported is this : The first section of the act of 1889 required the school trustees to be elected by ballot at the annual school meeting.

Now, section 18 of the supplement of 1894 directs that all elections for school trustees shall be by ballot; that two tellers shall be appointed who shall receive, and with the chairman of the meeting, shall count the votes; that the secretary shall record the name of each person voting; that the polls shall be open for an hour at least; that the ballots shall be either printed or written, and that if a trustee is to be elected to fill an unexpired term, the ballot should designate which of the persons voted for is for the full term, and which for the unexpired term.

This act contains no reference to the manner by which voting to raise money at any meeting shall be conducted.  It is insisted that this express direction in respect to the use of the ballot in the election of trustees, accompanied by a silence in respect to other proceedings at any school meeting, impliedly

repeals the previous statute requiring the use of the ballot in voting to raise money.

Now, as repeals by implication are not favored, the intention of the legislature to effect this purpose must clearly appear. It cannot be successfully contended that the mere fact of the re-enactment of the first section of the act of 1889 operates as a repealer of the second section. *Powers* v. *Shepard,* 48 *N. Y.* 540.

The ground taken is that the act of 1894 is a revision of the school law; at least a revision of the law so far as concerns the manner of voting at school meetings, and therefore furnishes the sole rule with regard to this subject. I do not so regard it. It is in no sense a revision. It does not pretend to be a statute reducing antecedent acts to one system. It is a mere amendatory act of the general statute, changing here and there a section of that statute, and introducing some new features, and changing or enlarging in details the provisions of some former acts. It is preceded by another supplement of the same general act, passed on the same day, and is followed by still another supplement of the same act, also passed on the same day. There are additional supplements passed at the same session, one of which (*Pamph. L.* 1894, *p.* 125) provides that at the election of trustees at school meetings, the board of education may designate the time of the opening and closing of the polls. Now, this last act is undoubtedly modified by the act of 1894, not because the latter is a revision of the former, but because it is a later act, in some respects inconsistent with the former. It is impossible to regard the act of 1894 as revisory of the preceding acts, and section 18 of the act of 1894 can have no greater force than if it stood alone.

Standing alone, it would not operate to repeal the second section of the act of 1889.

Nor can I see why the voter could not vote upon all the propositions upon one ballot. Each voter had the privilege of expunging or modifying any one or more of the several propositions.

The last objection raised is that women were permitted to vote in sufficient numbers to change the result of the election. The act of 1887 (*Pamph. L., p.* 149) confers upon women the right to vote at any school meeting in any school district of the state wherein they reside. In so far as this statute assumed to confer the right upon women to vote for school trustees, it has been adjudged unconstitutional. *Kimball* v. *Hendee, ante p.* 307.

The argument now presented is that the statute being void in part, is a total nullity; that it is impossible to eliminate the void part and leave existing any substantial independent enactment. In support of this contention, two federal cases are invoked, namely, *United States* v. *Reese,* 92 *U. S.* 214, and the *Trademark Cases,* 100 *Id.* 82.

In the first-named case, congress had passed an act which imposed a penalty upon election officers who prevented any voter from qualifying, or who refused to receive his vote, and imposed a punishment upon any person who bribed, intimidated or obstructed any citizen from qualifying or from voting. The court held that the act was too comprehensive, and that the power to pass it was derived from the fifteenth amendment, which extended only to a prohibition of any discrimination against voters, made on account of race, color or previous condition of servitude; and that the act in question included in its general terms acts done aside from those acts which were so discriminatory.

The Supreme Court held that the act could not be restricted so as to be confined to punishment for those acts concerning which congress could have constitutionally legislated.

In the second-named case, congress had provided a punishment for the violation of trademarks, but it was held that some of the trademarks, for the violation of which this punishment was provided, could not be constitutionally registered. It was ruled that inasmuch as the language of the act was too broad, the whole act was void. It will be perceived that both of the statutes were penal and criminal acts, and it was upon this ground that the rigor of construction was put.

"This is a penal act," said Chief Justice Waite, in delivering the opinion in the first case, "and must be considered strictly;" and Mr. Justice Miller, in delivering the opinion in the second case, remarked: "While it may be true that when one part of a statute is valid and constitutional, and another part is unconstitutional and void, the court may sustain the valid part, where distinctly separable so that it may stand alone; but it is not within judicial power to give the words used by congress a narrower meaning than was manifestly intended, in order that crimes may be punished which were not described in language that brings them within the constitutional power of that body."

The distinction between the rule of severability as applied to criminal acts, and as applied to statutes imposing mere civil obligations or conferring rights and privileges, is perceived by a comparison of the rulings in both cases with other federal decisions.

In *Keokuk N. L. Packet Co.* v. *Keokuk*, 95 *U. S.* 80, an ordinance imposing wharf duties was upheld so far as it did not conflict with the power of congress to regulate commerce, although, as was remarked, it might be conceded that the ordinance was too broad, and that some of its provisions were unwarranted.

So, in the case of *Florida Central Railroad Co.* v. *Schutte*, 103 *U. S.* 118, it was held that although a part of an act which purported to confer power to execute and exchange state bonds in aid of railroads was unconstitutional, yet this not did avoid another part of the act which gave a lien on the property of the railroad company to secure such bonds.

So, in *Vial* v. *Penniman*, 103 *U. S.* 714, the statute which relieved a certain class of debtors from liability to be imprisoned and have their property seized, was held not to be in conflict with the constitutional provision prohibiting legislation which impaired the obligation of contracts, so far as respected that part of the act which relieved the debtor from imprisonment. It was held that this part was severable

from the part which relieved the debtor's property from liability to seizure.

A comparison of these federal decisions will display a marked difference in the manner in which the severability of void parts of a statute is viewed, when the act is criminal in its character, and when it is civil.

Mr. Sutherland remarks that the rule is more stringent in regard to criminal statutes, citing the remarks of Mr. Justice Johnson, in *Wynehamer* v. *People*, 13 *N. Y.* 378. *Suth. Stat. Const.*, § 172.

In criminal statutes, it is deemed unfair to put upon the citizen the risk of judging what acts included within a statute are punishable, and what dispunishable, on account of the partial unconstitutionality of the statute.

The present act is one conferring privileges upon a class of the public. The question is whether it can be assumed that the legislature would not have conferred the power to take part in any matter at any school election, if it had known that in one matter the power granted was nugatory.

The statute, as already observed, contained a grant of privileges broader and more comprehensive than the legislature had the ability to enact. The facts in this case are analogous to the facts in the cases of *Mayor* v. *Dechert*, 32 *Md.* 369, and *Reid* v. *Morton*, 119 *Ill.* 118.

In the first of these cases, the act which professed to confer upon the mayor all the powers of a justice of the peace was held void so far as it invested him with judicial functions, but it was held good so far as it conferred upon him police powers, although both powers were conferred by the same section.

In the second of these cases, an act by its terms conferred jurisdiction upon a court over certain matters, not only within the city, but in a township outside the city. The act was held void as to a grant of jurisdiction outside the city limits, but good as to the conference of jurisdiction within the city.

In the present case, I think there is nothing to display on the part of the legislature, an intention not to confer upon females all the powers which the act professes to confer, which was within the ability of the legislature to confer. I think it cannot be said that the legislature would not have passed an act conferring power upon females to vote at all, because the power conferred to vote upon one matter is nugatory.

The assessment is affirmed.