PETER SCOLA, PROSECUTOR, v. BOARD OF EDUCATION OF THE TOWN OF MONTCLAIR AND NORMAN S. KELLOGG.

Argued November 5, 1908—Decided December 9, 1908.

1. Under the Public School act of 1903 (*Pamph. L.* 1904, *p.* 5) a board of education has the power to build a central heating plant from which heat is to be distributed through pipes to a group of schoolhouses situated in the vicinity of, but not adjoining, said central plant.

2. The School act requires that there shall be advertisements for proposals for the building, enlargement or repair of schoolhouses,

and that no bid shall be accepted which does not conform to the specifications therefor—*Held*, that after the reception of bids, it was not within the power of the board of education to modify the specifications by omissions and changes and award a contract to a former bidder, although the lowest, to execute the work according to the revised specifications, although at a price less than the original bid.

On *certiorari*.

Before Justices REED, BERGEN and MINTURN.

For the prosecutor, *MacLear & Fort*.

For the defendant N. S. Kellogg, *Guild, Lum & Tamblyn*.

For the defendant Board of Education of the town of Montclair, *Edwin R. Goodell*.

The opinion of the court was delivered by

REED, J. This writ brings up a resolution authorizing a contract to be entered into between the board of education of the town of Montclair and N. S. Kellogg for the construction of a central heating plant for five school buildings in the town of Montclair.

The resolution was adopted July 7th, 1908, at a regular meeting of the board of education, and it provides substantially that upon the full compliance of N. S. Kellogg with certain stipulations and specifications as to contract, and upon notice from the proper town officials that funds are available for the erection and completion of said buildings, the president and secretary of the board of education are authorized to execute contract for said building with N. S. Kellogg.

One of the reasons urged against the validity of this resolution attacks the power of the board of education to enter into any contract to construct the heating plant proposed to be erected.

It is not questioned that the board of education possessed the power to erect, enlarge, repair or furnish a schoolhouse or

schoolhouses.　Sections 52, 53, 72 and 76 of the Public School act, approved October 19th, 1903.　*Pamph. L.* 1904, *p.* 5.

The provisions of these sections, all contained in article 6 of the act of 1903, were accepted by the voters of Montclair under the provisions contained in section 243 of said act.

The point made is that the proposed structure is a heating plant and not a school building.　The facts are that there are four school buildings existing and another in the course of erection.　There is a grammar school building, a primary school building and a manual training school building upon the lot on which the central heating plant is to be placed.　The high school building is about two hundred feet away on an adjoining lot.　The Hillside grammar school building now being erected is about the same distance from the first three mentioned buildings, and near to the high school.　This cluster of five buildings constitute a group called "The Central Schools."　The buildings are of various ages, from fifteen to fifty years.

The central heating plant will be approximately sixty feet from the primary school building and two hundred feet from the high school and the Hillside grammar school buildings. The central heating plant is designed to furnish heat to all these five school buildings, and to these buildings only.

It seems manifest that the board had the ability to enter into a contract for heating one or all of these five schools, because artificial heat is essential to the use of the buildings designed for school purposes.　Therefore, had the board contracted for stoves for each room in each schoolhouse, or for single heaters to heat all the rooms in each house, such a contract would be clearly within the statutory authority conferred. The stoves would have been a part of the furnishing of the buildings, and the heaters would have been a part of the buildings themselves.

Now, if directly adjoining each house a room had been devoted to the generation of heated air, from which heated air was conveyed by pipes into the various rooms, there would still be no doubt that this was a part of the school building.

But the insistence is that the present proposed building will

be detached from any present or proposed school building, and therefore can be no part of the school building.

The only case in this state which I recall, as possessing any pertinence to the question thus presented, is that of *Chamberlain* v. *Cranbury,* 28 *Vroom* 605; *S. C. on error,* 29 *Id.* 347. That case arose under the old school law as amended in 1894. *Pamph. L., p.* 506. Section 19 of that act provided that the majority of legal voters of a school district could authorize the board of education of the dictrict to issue bonds for the following purposes:

(*a*) The purchase of land for school purposes.

(*b*) The building of a schoolhouse or schoolhouses.

(*c*) Making additions, alterations, repairs or improvements in or upon schoolhouses already erected, and the lands upon which they are located.

The question was discussed whether under this statute the voter could empower the board of education to issue bonds, not only for the purchase of a lot and the building of a schoolhouse, but also for fencing, grading, water-supply and furniture for the schoolhouse.

The Supreme Court held that the grading, fencing, digging of a well, or providing other means for supplying the school with water, and the equipping of the schoolhouse with school furniture, were all a legitimate part of the construction of the schoolhouse and the proper equipment of school property.

On error, the court of last resort observed: "We are inclined to so regard the fencing, grading and water-supply; so also any furniture which may be constructed with and permanently fixed to the building, such as slates or blackboards built into the wall. But we cannot so regard the ordinary movable furniture of a school which is not fixed to the building."

The court, it seems, imported the doctrine of fixtures into the question whether furniture was a part of the schoolhouse. If that test is applied in this case, we think the central heating plant is to be regarded as a part of the school buildings. It is to be applied to the use to which the schoolhouses are devoted. There is intention that it shall be so applied, and

there is annexation to the houses by pipes which will convey the hot air from the plant itself to the separate buildings. *Atlantic Safe Deposit and Trust Co.* v. *Atlantic City Laundry Co.,* 19 *Dick. Ch. Rep.* 140-146.

Nor does the fact that the heating plant is built as a single structure, and not in connection with the schoolhouse now in course of erection, matter, for the power to improve, repair or furnish school buildings is as plenary as the power to erect them.

So we think there is no defect of power to issue bonds upon this ground of objection.

There is, however, a ground upon which the resolution must be set aside. Section 52 of the School act of 1903, printed in the forepart of *Pamph. L.* 1904, *pp.* 5-21; enacts that "No contract shall be entered into for the building of a new schoolhouse or for the enlarging or repairing of a schoolhouse already erected except after advertisements made under such regulations as the board may prescribe." There is a proviso which does not affect the present case. Section 53 provides that "No bill for building or repairing schoolhouses or for supplies shall be accepted which does not conform to the specifications furnished therefor, and all contracts shall be awarded to the lowest responsible bidder."

These statutory provisions, as already observed, were accepted by the voters of Montclair in accordance with section 243 of the above statute.

In the present instance the advertisement for proposals directed the bidders to state the sum for which each would supply material for and erect the central heating plant, stating the amount to be deducted from the bid in case a specific change should be made in the material to be used in each of three particulars. Bids were received from eight bidders, the lowest of whom was N. S. Kellogg, whose bid was $26,945. .

The architect reported to the board of education a tabulated statement of the bids, with the remark that he had "had Mr. Kellogg in," and that Kellogg would deduct from the amount of his bid $1,140 for omitting the Smith system, and would deduct other specified sums for the changing or omitting of

certain work required in the specifications. By these changes and omissions Kellogg's revised bid was reduced to $23,763.37.

The resolution brought up authorized the president and secretary of the board of education to accept the contract with Mr. Kellogg upon the revised basis.

The reason assigned for this revision of the specifications, and this reduction of the amount to be paid Kellogg, was that the estimate of the amount of money necessary to be appropriated to the construction of the plant was insufficient to complete the general work as well as the particular work upon which Kellogg and the others bid, and so the changes and reduction of price was to bring the cost of the work within the estimated appropriation.

These reasons were, no doubt, conceived in good faith. The question, however, propounded is whether the resolution to award the contract to Kellogg was in conformity with the statutory scheme of competitive bidding. It is manifest that there was no competitive bidding upon the work as revised. Even if the accepted proposal had been for less work than included in the specifications—or, in other words, if the change was not in adding to, but only in discarding certain items which had been a part of the plan upon which the bidders had figured—it would, nevertheless, be a fact that the bidders had not bid upon the revised plan. What estimates each bidder would place upon the various items of work, which went to make up the entire estimate, does not appear. So, whether the amount which each person would have bid, if the specifications had included only the work which Kellogg subsequently agreed to do, whether it would have been more or less than Kellogg's price, is a matter for conjecture.

But there are not merely omissions, but changes in the plans as revised; changes in the Acme system and changes in the pipe coverings. This fact only accentuates the difference between the specifications as bid upon and the specifications upon the basis of which the contract was directed to be accepted.

It is because the legislative purpose to require competitive bidding will be foiled if municipal bodies can enter into a con-

tract upon a basis other than that advertised, that it has been held that a contract must correspond with the specifications upon which bids were invited.

In *State. Skirm* v. *City of Trenton,* 29 *Atl. Rep.* 158, it was said: "The contract set out in the return is also improper in allowing six months for the doing of the work, while the proposal for bids stated that the work should be completed in one hundred and twenty working days. Correspondence between the advertised proposals and the contract in this particular is enjoined by the statute, and is necessary to secure impartiality toward the bidders."

So in *Shaw* v. *City of Trenton,* 20 *Vroom* 339, Mr. Justice Magie observed: "In my judgment the contract awarded with a warranty of nine years was not the contract for which proposals were asked, and therefore the competition required by section 107 of the charter was not afforded."

Although this case was reversed by the Court of Errors and Appeals for another reason, the view expressed in the Supreme Court was concurred in. *Van Reipen* v. *Jersey City,* 29 *Vroom* 262-270.

In this last case it was held that bids having been invited upon the condition that the contractor should provide a reservoir capable of storing a water-supply for one hundred days' delivery at the rate of fifty million gallons per diem, the contract was not lawfully awarded to one of the bidders for the reason that it offered to provide a storage capacity sufficient for two hundred and fifty days.

Indeed this rule, that a contract must conform to the specifications, is one so essential to the preservation of the policy to be carried out by competitive bidding, that it has been recognized whenever the matter has been brought under judicial notice. 20 *Am. & Eng. Encycl. L.* 1169, and cases cited.

The resolution should be set aside.