JOHN P. KAY ET AL., PROSECUTORS AND PLAINTIFFS IN
ERROR, v. THE BOARD OF EDUCATION OF KEARNY
AND THE AMERICAN CONCRETE STEEL COMPANY
ET AL., DEFENDANTS IN ERROR.

Argued March 8, 1912—Decided June 20, 1912.

1. Where there was no direct proof that article 6 of the School law
had been adopted by vote in an incorporated town, but the reso-
lution of the board of education under review which provided
for the building of a school house was passed subject to the ap-
proval of the board of estimate, it will be deemed that said article
governed the administration of school affairs in that town.
2. Where a public board, required by legislative enactment to award
a bid for public work to the lowest responsible bidder after ad-
vertisement, allows bidders to furnish "full and complete plans
and specifications showing the method of construction" to be
approved by the board's architect—*Held*, that all bidders were
not made acquainted with the specifications in their entirety by
this method, and that the opportunity to compete, afforded by
definite specifications open to all bidders and to which all could
conform, was not given.
3. A public board, charged with the duty of obtaining bids for pub-
lic work, after advertisement, and of awarding a contract for it
to the lowest responsible bidder, will not have discharged its
duty in that regard where, after bids have been received and
opened, but before it has formally taken final action upon the
bids, it agrees with the then lowest bidder to diminish the amount
of the work in consideration of a reduction of the bid.

On error to the Supreme Court.

For the plaintiffs in error, *Pierre P. Garven* and *Gilbert
Collins.*

For the defendants in error, *Arthur F. Egner* and *Robert
H. McCarter.*

The opinion of the court was delivered by

VOORHEES, J. This writ of error brings to a test the
propriety of a judgment of the Supreme Court, dismissing a
writ of *certiorari.* By the latter writ, a resolution passed by

the board of education of the town of Kearny, on October 2d, 1911, was reviewed, awarding a contract to the defendant, the American Concrete Steel Company, for the sum of $94,750 for a re-inforced concrete school, and providing that the contract be signed, subject to the approval of the board of school estimate, on the evening of October 18th, 1911. It was further resolved that a copy of the estimate be sent to each member of the board of school estimate.

On the same evening, the following entries appear in the minutes: "American Concrete Steel Company proposes to deduct $3,500 from their proposal if the general basement is made ten feet and the gymnasium fifteen feet under slab." Also a further resolution of the estimate of money required for the erection of the school building in which appears the item "General contract $91,250." "Note—Where the American Concrete Steel Company allowed $3,500 for the difference in the height of the basement, E. W. Waldron & Co. would only allow $1,908 in brick."

In September, 1911, the board of education accepted the plans and specifications of an architect for a new school house, directing that bids be separately received for brick and concrete construction, that is partly brick and partly concrete, and they also in the alternate. provided for a construction entirely of concrete. The specifications provided with great particularity for the brick and concrete construction, but as to the concrete construction, the provision was as follows:

"Alternate bids for the construction of the building throughout of re-inforced concrete will be considered. Full and complete plans and specifications showing the method of construction must be submitted to and approved of by the architect seventy-two hours before the opening of bids. Only such systems as have been previously approved of by the architect as above will be considered."

There were nine proposals submitted, two of them only for the concrete construction, the defendant, the American Concrete Steel Company, being the lower of the two bids, the contract was awarded to it by the resolution above recited.

It appeared by the proofs that the receipt of the bids was the first business transacted by the board on the evening of October 2d; that immediately after their reception, they were referred to the committee on buildings and grounds, and a recess was declared by the president. The board then retired to another room, and went into a committee of the whole 'and looked over the bids; that there was some difficulty in listing them, but after it had been done as well as they could, it was found that concrete was perhaps cheaper, and they decided to adopt it; at that time, Mr. Conklin, the architect, stated that the Concrete Steel Company would be able to reduce their bid $3,500 if the basement height was lessened.

The president of the steel company had previously mentioned to the architect that such alteration would save about $3,500. The steel company's president was sent for and came into the private room where the board was in session as a committee of the whole. The board announced to him that they had decided to award the contract to his company, and asked whether he would make a cut of $3,500 suggested by the architect; he assented and wrote the memorandum agreeing to it above referred to.

The board then came back into the public room and voted to award the contract to the steel company on its original bid, and then voted for the reduction of $3,500 which the company had offered to make if the alterations were made.

The steel company, with their bid, submitted their own working plans and specifications which indicated their system and which had been approved by the architect seventy-two hours before the opening of bids.

The School law, by article 6, which includes sections 38 to 76 (*Comp. Stat.*, p. 4735, 4747), provides for the regulation of boards of education in cities. Sections 72 and 73 enact that there shall be a board of school estimate in every city school district, and then define its duties. Section 52 prohibits the execution of any contract for building of a new school, except after advertisement, and section 53 forbids the acceptance of any bid for building school houses "which does not conform to the specifications furnished, and all contracts

shall be awarded to the lowest responsible bidder." *Comp. Stat., p.* 4741. Section 243 (*Comp. Stat., p.* 4805) provides, that by a referendum vote a town may accept the provisions of article 6 and be governed in all respects by it. By the act of 1909 (*Pamph. L., p.* 277; *Comp. Stat., p.* 4762, § 105c) it is enacted that "Every school district heretofore organized * * * in any town * * * and now acting under the provisions of article 6 * * * shall be deemed and held to be organized and existing under and in all respects governed by the provisions of said article."

There was, therefore, two ways in which the district of the town of Kearny might have legally been governed by the city scheme as set out in that article, one by the vote of its inhabitants, and the other by having acted under it before the passage of the act of 1909.

There was no direct proof that the city plan had been adopted by vote, but the fact that the resolution was passed, subject to the approval of the board of estimate, and that copies of the resolution were ordered to be sent to each member thereof, is persuasive that such board existed in Kearny, and hence article 6 governed the administration of school affairs in that town.

Therefore, before a bid for the construction of this school house could be accepted and a contract awarded, it was requisite that it be the lowest bid received in answer to advertisement, and conform to the specifications furnished.

The board decided to adopt the alternate of concrete construction throughout. For this work, the board of education did not furnish the specifications in their entirety, but to the bidder was committed the making of "full and complete plans and specifications, showing the method of construction." This probably involved a double test in ascertaining the lowest bid, viz., least money and most satisfactory plan. But the latter was not submitted to the competing bidders, it remained with its author, unseen except for exhibition to the architect, seventy-two hours before the bids were received, for his rejection or approval. The latter feature, it may be remarked, might work to smother competition, if disapproval of such

specifications were made at the very beginning of the pre-
scribed interval of seventy-two hours by preventing the sub-
mission of other plans. All bidders were not made acquainted
with the specifications in their entirety by this method.

The bids were thus not competitive within the principle
approved in *Van Reipen* v. *Jersey City, 29 Vroom 262,* be-
cause the opportunity to compete, afforded by definite speci-
fications open to all bidders and to which all could conform,
was not given.

The court below held that "full and complete plans and
specifications showing the method of construction" was merely
providing for the statement of a method by which the re-
inforced concrete was to be made, and this necessarily involved
the submission to an expert in order that the board might be
advised whether the proposed method was feasible and de-
sirable. But the proofs would indicate that more was involved
than method. The difference between the two constructions
under consideration affected the exterior of the walls. In the
compound construction of brick and concrete, the outside of
the walls would be brick. In the construction entirely of
concrete, of course, the entire walls would be composed of the
latter material. Of this the president of the company said:

"The building having re-inforced exterior walls, it became
necessary to illustrate clearly and concisely what these walls
would be made up of. The original specifications provided
for the working stresses in concrete, and also in re-inforced
steel. It then became necessary to duplicate the *façade*
shown on the original plans in concrete, illustrating thereon
the necessary re-inforced steel required for this work, and the
details or working drawings that were submitted, covered
these points. The alternate clause in specifications providing
for 'full and complete plans and details,' they were made
complete."

The same witness testified that the plans prepared by the
architect called for brick trimmed with stone or terra cotta,
resting on concrete foundations, and so far as the exterior
was concerned, they had no reference to the re-inforced con-
crete; that in them (the original specifications) there is

reference to the re-inforced concrete of the exterior where it specifies the materials and the proportion of the same that is to be used as the basis of the re-inforced concrete work, and when asked "Does not that specifically apply to the interior and not to the exterior?" he answered, "It could be held to govern both."

The plans furnished by the bidder called for walls of sixteen inches in thickness, while the brick walls were specified by the board to be sixteen inches and twenty inches thick. This witness, on that topic, testified that his authority to change the thickness of the walls to that extent was derived from his study of engineering, and as an expert engineer he was capable of preparing the plans. As to the system referred to in the alternate requirements, he stated that there were many different systems and that his company had one of its own. But that was not involved in this building. That he adopted the system that the architect specified and used what he called for.

I think it is clear from this testimony, that competitive bidding for the concrete work was put upon different bases. Each builder selected his own data. In *Dill. Mun. Corp.* (*5th ed.*) 211, the author says:

"The plan and specifications are essential to competitive bidding because it is only through their agency that there is a reasonable assurance that all bidders are competing upon the same basis and without favoritism and that no fraud enters into the award. Under such a charter provision, a city cannot require each bidder to submit with his bid a scheme for doing the work. Such a course leaves no definite basis for competition among the bidders, and the municipality has no authority under such a statute to make comparisons as to different material proposed to be used, or the work proposed to be done according to different bids. In keeping with the same general principle that all the proceedings must be of such a nature as to secure competition, the bid must conform to the plans, specifications and advertisement of the municipality, and the contract entered into must also conform to the plans, specifications and advertisement."

There is a public policy involved in a statute requiring a contract for public work to be awarded to the lowest bidder after advertisement for proposals, and "that each bid, actual or possible, shall be put upon the same footing." *Case* v. *Trenton,* 47 *Vroom* 696.

We may now turn to the effect upon the bid of the offer to reduce it, dependent upon alterations to be made by which the quantity of construction would be diminished. It seems to be clearly shown that before the bids were opened, the concrete steel company had suggested the changes and its willingness to make this modification in its bid; and that pending the formal passage of the resolution of acceptance, that suggestion was made to the board, and was definitely agreed to by the bidder in writing.

It is said that before the reduction the board had communicated to the steel company its decision to award the bid to that company, but as yet no official action had been taken, and when later that action was taken it was with the full knowledge possessed by the board, and with the express agreement between the bidder and the board that the original bid was not the one contemplated, but a modified bid based upon changes to be made in the plans and specifications.

Now the changed plans and specifications had not been furnished to bidders, and it was not within the power of the board to accept a bid not conforming to such specifications as had been furnished, or to determine the lowest bidder under such circumstances. For aught that appears, if the height had been reduced in the specifications, lower figures would have been sent in by others, perhaps making one of them the "lowest responsible bidder."

A public board, charged with the duty of obtaining bids for public work, after advertisement, and of awarding a contract for it to the lowest responsible bidder, will not have discharged its duty in that regard, where, after bids have been received and opened, but before it has formally taken final action upon the bids, it agrees with the then lowest bidder to diminish the amount of the work, in consideration of a reduction of the bid.

We conclude, therefore, that the competition which the legislature designed to secure by its enactments was not obtained in this case, because there was not a full publication of the *criteria* which must govern all bidders before competition can exist.

Because of the disposition of this case upon the foregoing grounds, it becomes unnecessary to consider the case of *Scola* v. *Board of Education of Montclair,* 48 *Vroom* 73.

The judgment of the Supreme Court will be reversed, and the resolutions brought up by the writ of *certiorari* will be set aside.

*For affirmance*—None.

*For reversal*—THE CHIEF JUSTICE, GARRISON, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, KALISCH, BOGERT, VREDENBURGH, VROOM, CONGDON, WHITE, TREACY, JJ.   14.